**LYNCH CARPENTER LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Matthew J. Zevin (SBN 170736)
mattz@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
James B. Drimmer (SBN 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:   (619) 762-1900
Facsimile:   (858) 313-1850

*Attorneys for Plaintiff and
Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADINA RINGLER, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARTER'S, INC., and DOES 1-50, inclusive,<br><br>Defendants. | Case No.:  2:24-cv-6878<br><br>**CLASS ACTION COMPLAINT**<br><br>**Violations of:**<br><br>1. **California's Unfair Competition Laws ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*;**<br><br>2. **California's False Advertising Laws ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *et seq.*;**<br><br>3. **California Consumer Legal Remedies Act ("CLRA"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*;**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Adina Ringler ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Defendant Carter's, Inc. ("Carter's" or "Defendant"), and states:

## I.    NATURE OF ACTION

1.    "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for its merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin, *et al*., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mκτg. 826, 835 (2023) ("Staelin").

2.    Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mκτg. 52, 55 (1992) ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. Retailing 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.[2]

3.    At all relevant times, Defendant has continually advertised false price discounts for merchandise sold throughout its stores and on its website, carters.com. In bringing this putative class action complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme on apparel, accessories, shoes, and other items sold in its brick and mortar stores and e-commerce website, carters.com.

4.    False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[3] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.    The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm

---

[2] Staelin, 87 J. MKTG. at 834 (retail firms "can increase their profits and consumers pay higher prices when firms engage in fictitious pricing practices"); *id.* at 835 ("a firm's financial gains from posting inflated reference prices are likely taken out of the consumer's pocket.").

[3] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

consumers: the DVD seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchasing the DVD for $10.00 assume they got a "good deal" since the DVD was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.     The consumer's presumption and purchase stem directly from the seller's deception. For example, if the seller tried to sell that same DVD for $10.00 **without** referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers *will* purchase the DVD at $10.00. By doing so, the seller has fabricated an artificial and illegitimate increase in consumer demand for the DVD through the reasonable, but incorrect, ***perceived value*** of the DVD in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD, based on the false discount, in turn creates a new, albeit artificial and illegitimate, market price of the DVD. The seller can therefore create an artificially inflated market price for the DVD of $10.00 by advertising the false "original" price and corresponding fake discount.

7.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, California and federal law. Specifically, Defendant violates and continues to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); and California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (the "CLRA"), as well as the Federal Trade Commission ("FTC") Act

("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.     Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more of Defendant's items advertised at a purported discount from a fictitious higher reference price from a Carter's store and/or its website, carters.com. Plaintiff intends to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of their sales of merchandise offered a false discount.

## II.     JURISDICTION AND VENUE

9.     This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

10.     The Central District of California has personal jurisdiction over Defendant because it is a Delaware corporation which conducts business in the State of California. Defendant conducts sufficient business with sufficient minimum contacts in California, and/or otherwise intentionally avails itself of the California market through the operation of Carter's stores within the State of California, and because it regularly sells merchandise on its website to California citizens.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Plaintiff resides in this District, as well as under 28 U.S.C. § 1391(b)(2) because Defendant transacts

substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendant's misconduct alleged herein occurred in this District.

## III.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its merchandise at its Carter's retail stores and e-commerce website, carters.com.

13.    As mentioned above, retailers like Defendant benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin, *et al.*, *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[4] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[5]

14.    Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[6] In other words, consumers view Defendant's deceptive

---

[4] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby, & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, J. LAW & ECONOMICS 16 no. 1 (1973): 67-88, at 68-69.

[5] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. J. POLITICAL ECONOMY 78, no. 2 (1970): 311-29, at 311-12.

[6] Dhruv Grewal & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?*, J.PUBLIC POLICY & MARKETING (1992): 52-62, at 54;  *see also*

advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[7] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[8] Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[9]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[10] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[11] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a

---

Richard Thaler. *Mental Accounting and Consumer Choice*. MARKETING SCIENCE 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[7] Dhruv Grewal, & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?,* J. OF PUBLIC POLICY & MARKETING (1992): 52-62, at 52.

[8] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain.* J. OF CONSUMER PSYCHOLOGY 13, no 3 (2003): 328-38, at 328.

[9] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205.

[10] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, J. OF CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 68.

[11] Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*. J. CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 62.

CLASS ACTION COMPLAINT

product.[12] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[13] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[14] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[15] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][16]

---

[12] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan. *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* J. OF MARKETING 62 (1998): 46-59, at 48.

[13] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting and Consumer Choice.* MKTG SCI. 4, no. 3 (1985): 199-214, at 212.

[14] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue.* J.PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

[15] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research.* MARKETING SCIENCE 14, no. 3 (1995): G161-G169, at G161; *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product.* J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[16] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue.* J.PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

CLASS ACTION COMPLAINT

16.    In Staelin, *Regulation of Fictitious Pricing*, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, recently built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[17] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.    Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[18] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any*

---

[17]*See* Staelin, *Regulation of Fictitious Pricing* (manuscript at 3) ("It is now well established that many consumers get extra utility beyond that associated with consuming the product from purchasing it on deal (Thaler 1985, Compeau & Grewal 1998, Krishna et al. 2002) and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

[18] Staelin, *et al.*, *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

CLASS ACTION COMPLAINT

discount and are actually *overpaying* for Defendant's product because, as Staelin, *et al*. put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, **with fake discounts having a substantially larger effect than real discounts**.") *Id.* at 835 (emphasis added).

## B. Defendant Engages in a Fraudulent Price Discounting Scheme.

18.    For years, Defendant has engaged in a fake discounting scheme that harms consumers by advertising apparel, accessories, and other items at purportedly discounted "sale" prices in its retail stores and website, carters.com. In short, Defendant attaches price tags ("ticket prices") to its merchandise intended to represent the "original" former price at which Defendant sold its products both in its brick-and-mortar stores and on its website, carters.com. Although the ticket prices use the term "MSRP" next to the price, they also include a supposed "Date of Birth" ("DOB") that Defendant claims was the date that it supposedly began offering the product at its full ticket price. The ticket prices also reference the website, carters.com, thus giving the impression that the same merchandise is available for the same price on Defendant's website.

19.    In its stores, Defendant aggressively markets deep discounts from the advertised ticket prices primarily through placard signage resting on or attached to the product rack or shelf where the merchandise is located. The signs are printed in an eye-popping red or blue-and-white color scheme, boldly emphasizing a deep discount framed as "___% Off" the associated ticket price(s).[19]

20.    The photos below show representative examples of Defendant's storewide practice of advertising discounts in its brick and mortar stores.[20]

---

[19] The advertised discounts typically range between 40% to 60% off the ticket price.
[20] *See* **Exhibit A**, additional Carter's in-store photographs depicting the extent and prevalence of discount signage throughout the store.






21.    Similarly, on its website, carters.com, Defendant advertises the same discounts sitewide by placing a line through the ticket price (a "strikethrough"), as well as a representation of the purported "% off" (e.g., 50% off) next to the purportedly discounted price that is displayed in large, bold text: [21]



[21] Attached hereto as **Exhibit B** are numerous snapshots from carters.com depicting falsely discounted merchandise. Attached as **Exhibit C** are numerous snapshots of the website acquired from the Wayback Machine ("WBM"). WBM (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, WBM permits users to view it exactly as it appears on the date the page snapshot is taken. The date of the snapshot is shown at the top of each page.

CLASS ACTION COMPLAINT



22.     Most products offered on the website also have a small information tab which, if clicked, leads to a "Disclaimer" that states:

DOB [mo/year]

Many of our collections have a DOB (Date of Birth) on the price tag or on their website product page. This is the date that this item or a similar item was originally offered for sale at the MSRP.

MSRP is our Manufacturer's Suggested Retail Price at which we suggest our collections be initially offered. We list an MSRP on our products that we sell ourselves and that sell through our wholesale partners. Our wholesale partners are free to use our MSRP or set a different selling price, actual sales may or may not have been made at MSRP in any certain area or in all areas. Prices may vary by channel or location.[22]

---

[22] Carter's sells certain product lines through certain wholesale partners, such as JCPenney and Target, but according to Carter's Form 10-k filed with the Securities and Exchange Commission, it appears that those products are "exclusive" branded merchandise made exclusively for the wholesalers, meaning they are not the exact same products sold in Carter's stores or on its website. In other words, based on the Form 10-k, Plaintiff alleges that the products available at Carter's stores and on its website are *only* offered and available for purchase through those two channels, and not through Carter's wholesale partners.

CLASS ACTION COMPLAINT

23.   Thus, Defendant states in no uncertain terms that the exact same (or similar) item "**was originally offered for sale at [the ticket price]**" on the Date of Birth. In other words, Defendant affirmatively represents that its ticket prices are not just "suggested" prices, but rather, they are **actual, bona fide <u>former</u>** prices at which Defendant offered the product for sale in the recent past.

24.   The products sold at Defendant's brick and mortar stores are the same products offered on the carters.com website.

25.   In reality, at both the brick-and-mortar Carter's stores and on the carters.com website, the products are hardly, if ever, offered for sale, let alone actually sold, at the stated ticket prices. Instead, those prices are used solely to induce consumers to make purchases and spend money under the reasonable, but incorrect, belief that the merchandise was previously offered and sold at the reference price for a reasonably substantial period of time.

26.   Thus, even if Defendant did previously offer its merchandise at the full ticket price for some short period of time (something Defendant rarely, if ever, does), that limited offering would do little to legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be either the ***prevailing*** market price for the item during the three months preceding the advertisement, or the ***prevailing*** market price during the three months after the original DOB ("date of birth") indicated on the price tag. Cal. Bus. & Prof. Code § 17501. *See also* 16 C.F.R. § 233.1(a) (requiring that a comparison reference price be the "price at which the article was offered to the public ***on a regular basis for a reasonably substantial period of time***.") (emphasis added).

27.   The "MSRP" qualifier accompanying Defendant's in-store reference prices on its exclusive (and any fractional non-exclusive) items, is not a comparison to another market, such as with "compare at" qualifiers. To the extent Defendant's advertised discounts can be characterized as "suggested retail prices," or "MSRPs," Defendant's advertised reference price and discounting scheme also violates 16

C.F.R. § 233.3, which pertains to "advertis[ements] [of] retail prices which have been established or suggested by manufacturers." This is because 16 C.F.R. § 233.3(a) provides that "[t]o the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer." (emphasis added). Here, the items sold in Defendant's Carter's retail stores and carters.com are rarely, if ever, sold there, or anywhere, at the "list or suggested retail prices"—and certainly not at a "substantial number of sales." Moreover, as the manufacturer and exclusive retailer of most, if not all, of the Carter's' retail merchandise, Defendant knows, or certainly should know, that substantial sales at these reference prices are not occurring. *See* 16 C.F.R. § 233.3(d) ("[I]f the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price."). At the very least, the resolution of these issues raises a reasonable question of fact.

28.    In sum, Defendant's fake discount scheme does not comply with the law and is intended to increase sales while depriving consumers of the benefit of their bargain.[23] Indeed, this conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Nowhere in Defendant's stores or on its website does Defendant disclose that its ticket prices are **not**: (1) actual, bona fide former prices; (2) recent, regularly offered former prices; or (3) prices at which identical (or even substantially similar) products are regularly sold in the market. Nor does Defendant disclose the dates on which its ticket prices last prevailed in the market.[24] The omission of these material disclosures,

---

[23] Staelin *et al.*, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

[24] To the extent Defendant contends that its "DOB" dates on its in-store price tags somehow bring it into compliance with the FAL, this argument fails for at least two additional reasons. First, the term "DOB" is meaningless to consumers who do not

coupled with Defendant's use of fake reference and sale prices renders Defendant's pricing scheme inherently misleading to reasonable consumers, like Plaintiff, who have no way meaningful way of discerning that Defendant's pricing representations are illegal without substantial, time-consuming, and costly investigation before *every* purchase.

## C. Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

26.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[25] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[26] Consumers are misled and incorrectly overvalue Defendant's products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal

---

search Defendant's website, but "it is unrealistic for Defendant[] to expect consumers to pull out their smart phones and search the retailer's website for a definition [while they are shopping.]" *Chester v. TJX Companies, Inc.*, No. 515CV01437ODWDTB, 2016 WL 4414768, at *11 (C.D. Cal. Aug. 18, 2016). Second, the already-vague "DOB" term provides only a month and year, and not a specific day or range of days, but Cal Bus. & Prof. Code § 17501 requires "the date when the alleged former price did prevail [to be] ***clearly, exactly and conspicuously*** stated in the advertisement." Lastly, on information and belief, Plaintiff alleges that most Carter's new merchandise is offered at a discount the moment it hits the floor.

[25] Richard Thaler, *Mental Accounting and Consumer Choice*, MKTG SCIENCE 4, no. 3 (1985): 199-214, at 212.

[26] Jerry B. Gotlieb & Cyndy T. Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[27]

27.    Accordingly, all consumers who purchase Defendant's merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Defendant's merchandise. This is because the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Specifically, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin, *et al.*, *supra*, at 835.[28] Thus, all consumers who purchase products from Defendant pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are

---

[27]Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan, *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*, J. OF MKTG 62 (1998): 46-59, at 46.

[28] *See also* Thaler, Richard. *Mental Accounting and Consumer Choice.* MKTG SCI. 4, no. 3 (1985): 199-214, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'."); Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Dhruv Grewal, & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue.* J. PUB. POL'Y & MKTG 18, no. 1 (1999): 3-10, at 7.

CLASS ACTION COMPLAINT

inconsequential to the injury they incur when purchasing Defendant's merchandise. Rather, all consumers who purchase falsely discounted products have overpaid and are deprived the benefit of their bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

28.    Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by all shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[29] The aggregate demand curve for a product, including Defendant's products, represents consumers' valuation of that product as whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

29.    As a result, Defendant's pricing scheme necessarily impacts the market prices of its products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class members thus suffered a common impact from Defendant's misconduct.

---

[29] Mankiw, N. *Essentials of Economics.* 8th Edition. Boston, MA: Cengage Learning, 2015, at 66 ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also,* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition. New York, NY: W. W. Norton & Company, 1992, at 23-38, 144-57, 233-353 & 285-312.

CLASS ACTION COMPLAINT

**D.    Investigation**

31.    Plaintiff's counsel has conducted a large-scale, comprehensive investigation into Defendant's fake discounting scheme at its Carter's stores and online at carters.com. Plaintiff's counsel tracked items at carters.com independently from approximately May 24 to September 1, 2023, on a daily or near-daily basis. Indeed, everything offered on carters.com appears to be always, if not virtually always, advertised at discounts from higher reference prices. This confirmed allegations in Section III.B. above—that items for sale on carters.com are perpetually and uniformly priced with substantially "discounted" sale prices appearing next to both the "crossed out" (or "strikethrough") "original" price, next to the lower "sale" price. Attached hereto as **Exhibit D** is a summary of product tracking data collected by Plaintiff's counsel during 2023.

32.    Plaintiff's counsel also retained and deployed a preeminent computer programmer and non-testifying consulting expert to construct a data collection software application that monitored, ***on a daily basis***, Defendant's pricing practices for every product offered for sale from at least May of 2023 through February 2024 on carters.com. The process used to obtain the original and sale price for products on carters.com leveraged an open-source software library which is used for software test automation.  Plaintiff's counsel's consultant developed a proprietary application utilizing the library that initiated a web browser, loaded the URL (carters.com), then inspected the content of the page, isolating each of the links to the product.  The application crawled through each link, loading the pages one at a time and ultimately spanning the entire website.  The application was designed to mimic what a search engine like Google does when it indexes a website. Once it loaded each page, the application sought out each of the products that were on sale. When it identified a product on sale, the application would record all the information about that product—e.g., price, sale, date, URL—and take a screenshot of the product. The application would also take a screenshot of the entire webpage, top to bottom, for

verification that the data was not made up or tampered with in any way. This application was run twice a day, every day, on three different servers in different geographic locations around the country. This data was later aggregated into a single database where a timeline of the sale price for each product could be established. This data collection conclusively demonstrates Defendant's products at carters.com are—just like its brick-and-mortar retail store products—constantly discounted on a rolling basis *See generally* **Exhibit E**, a sample of items identified as being discounted at the same reference and sale price for at least 95 days in a row.

33.    Plaintiff's counsel has also tracked Carter's physical store locations in California from April 18, 2024 through the present, and in Oregon from March 13, 2024 through the present. Plaintiffs' counsel has also monitored Defendant's pricing in New York. Notably, on all observed occasions, all products observed remained "discounted" under the same, uniform pricing scheme[30] at all locations regardless of the state and year. Attached as **Exhibit F** to this complaint is a list of exemplary products tracked in California. The only thing that changed was the advertised discount and/or reference price on certain merchandise. In other words, all items had price tags that were constantly "discounted" by in-store signage indicating a substantial percent off ("__% Off") or whole-price reduction discount.

34.    Thus, the investigation confirms that the "original" or "price tag" reference price of the items Plaintiff purchased were never the actual selling prices of those items because they were never offered at those prices, but rather, consistent with Defendant's uniform scheme, continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive, uniform, and systematic practice at Defendant's Carter's stores and online carters.com, as thousands of items remained continuously discounted throughout the investigation period, including those products purchased by Plaintiff. Indeed, the investigation indicated that Carter's merchandise is never offered for sale at its full "original"

---

[30] That is, the fake discounting scheme described above in Section III.B. has appeared uniformly implemented at each location. *See* **Ex. A**.

CLASS ACTION COMPLAINT

price—and certainly are not "on a regular basis for a reasonably substantial period of time," as required by the FCTA. *See* 16 C.F.R. § 233.1 ("[T]he former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time"); 16 C.F.R. § 233.3 ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.").

35.    Plaintiffs' counsel also researched carters.com with the WBM. The website snapshots recorded by the WBM are consistent with the investigation. *See* **Ex. C.** The website snapshots recorded by the WBM showed discounted prices on carters.com merchandise across several months before Plaintiff's purchases.

36.    Thus, the false discounting scheme used by Defendant on its Carter's branded merchandise is uniformly and identically applied on all, or virtually all, of the Carter's products sold through Defendant's California brick-and-mortar stores and e-commerce website, carters.com.

37.    Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## IV.    PARTIES

### Plaintiff Adina Ringler

39.    Plaintiff Adina Ringler resides in, and is a citizen of, Los Angeles, California. On March 6, 2024, Plaintiff Adina Ringler went shopping for some new clothing at Carter's store located at the Granada Hills Outlet. In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Ringler purchased the following items at the Carter's Granada Hills Outlet store on March 6, 2024:

| No. | Item: | "Original" Price: | Purported Discount: | Purchase Price: |
|---|---|---|---|---|
| 1 | Acces Socks 195861360278 | $22.00 | 50% Off | $11.00 |

| No. | Item: | "Original" Price: | Purported Discount: | Purchase Price: |
|---|---|---|---|---|
| 2 | Girls Denim Bottoms 195861007364 | $34.00 | 60% Off | $14.00 |
| 3 | Girls Layering 192136125648 | $28.00 | 50% Off | $14.00 |
| 4 | Playw Knit Tops 197347416028 | $20.00 | 50% Off | $10.00 |
| 5 | Girls Knit Bottoms 192136150503 | $22.00 | 50% Off | $11.00 |

40.    During her time at the Carter's store on March 6, 2024, Plaintiff Ringler browsed several items before deciding on what item to purchase. After reviewing the advertised sale price for the items listed above, Plaintiff Ringler decided to purchase the above listed items.

41.    Indeed, after observing the original ticket prices of the item and the accompanying "% Off" advertisements and sale prices, Plaintiff Ringler believed she was receiving a significant discount on the items she had chosen. Her belief that the discounted prices on the items was limited and would not last was material and integral to her purchase decision. She would not have made the purchases were it not for the significant bargain she thought she was receiving. On all products, the advertised discounts were a material representation to her, and she relied on them in making her purchase decision. However, Plaintiff Ringler did not receive the benefit of her bargain.

42.    Plaintiff Ringler has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff's Economic Injury Is Readily Quantifiable**

43.    Plaintiff incurred quantifiable monetary injury as a result of Defendant's fraudulent pricing scheme. Plaintiff overpaid for each product she purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original belief that each product she purchased was discounted and thus that its value

was significantly greater than the sale price for which she purchased it, Plaintiff in actuality paid an *inflated* price for the products she purchased.

44. That is, the items Plaintiff purchased were all worth less than the amount Plaintiff paid for each of them, and if Defendant had not employed the falsely advertised ticket prices for those items, then those items would not have commanded such high, inflated prices. The price premium Plaintiff paid—i.e., the difference between the amount Plaintiff paid and the value received, or the but-for price the product would have commanded absent the false discounting scheme, can be isolated through multiple expert-based models, including hedonic regression, conjoint analysis, and market simulation, which Plaintiff will further describe in her motion to certify this action as a class action pursuant to Fed. R. Civ. P. 23.

### Plaintiff Has Standing For Injunctive Relief and Lacks An Adequate Remedy at Law

45. Plaintiff does not have an adequate remedy at law, and is susceptible to recurring harm because she likes the style and brand of products at Defendant's stores, and she wants to purchase new and additional items from Defendant in the future. Indeed, Plaintiff has shopped at Carter's on behalf of her children on numerous occasions in the past, and Carter's sells a wide variety of popular children's merchandise of the type that Plaintiff will need and would like to continue to purchase in the future either for her own family, or as gifts for friends and/or other family members. However, due to the large variety of styles and sizes of merchandise offered, Plaintiff will be unable to parse what prices are inflated and untrue, and what, if any, prices are not, and she may again, by mistake, purchase falsely discounted products from Defendant in the future based on the reasonable, but false, impression that the advertised ticket price(s) are *bona fide*. In short, Plaintiff will have no reasonable means to determine in the future whether Carter's is continuing to advertise false ticket prices and discounts, or whether it has stopped

doing so, and she is therefore susceptible to future deception and recurring harm in the immediate future.

46.    Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the general public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee them the appropriate assurances.

47.    Moreover, Plaintiff lacks an adequate remedy at law with respect to her claims seeking equitable restitution because she has not yet retained an expert to determine whether an award of damages can or will adequately remedy her monetary losses caused by Defendant. Particularly, as legal damages focus on remedying the loss to the Plaintiff, and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the defendant, legal damages are inadequate to remedy Plaintiff's losses because Plaintiff does not know at this juncture, and is certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.

**Defendant**

48.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Carter's is a Delaware corporation with its principal executive offices in Atlanta, Georgia. It is therefore a dual citizen of Delaware and Georgia. Defendant owns and operates Carter's stores in California, and throughout the United States, where it advertises, markets, distributes, and/or sells clothing and accessories for infants and young children.

49.    According to its latest Form 10-K filed with the Securities and Exchange Commission, Carters is the "largest branded marketer of young children's apparel in North America," and it owns "two of the most highly recognized and trusted brand names in the children's apparel market, *Carter's* and *OshKosh B'gosh*." Based on information and belief, including a review of Carter's public filings with the Securities and Exchange Commission, Plaintiff alleges that Carter's does not sell any non-exclusive, or national-branded products. Accordingly, its entire product line consists of its own private-branded products.

50.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the harm suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

51.    Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices and former reference prices. Defendant concealed from consumers the true nature and value, and quality of the products sold at their Carter's stores and on the Carter's website.

52.    Defendant intentionally concealed and failed to disclose material facts regarding the truth about its false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Carter's products in its stores and on its website.

53.    At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

## V.    CLASS ALLEGATIONS

54.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant:

> All persons who, while within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from Carter's (in-person or online) one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more sub-classes, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

55.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been harmed by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

56.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

> a.    whether, during the Class Period, Defendant used falsely advertised reference prices on its product labels and falsely advertised price discounts on merchandise sold in its stores and on its website;

b.    whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.    whether, during the Class Period, the original price advertised by Defendant was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.    whether Defendant's advertised sale prices reflect any actual discounts or savings;

e.    whether Defendant's purported percentage-off discounts reflect any actual discounts or savings;

f.    whether Defendant's alleged conduct constitutes violations of the laws asserted;

g.    whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

h.    whether Plaintiff and Class members are entitled to restitution and/or damages, and the proper measure of restitution and/or damages; and

i.    whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparison.

57.    ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

58.    ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

59. ***Superiority***: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

60. All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold by Carter's.

61. Plaintiff is informed that Defendant keeps extensive computerized records of its customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

# VI.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")
**CAL. BUS. & PROF. CODE §§ 17200,** *et seq.*

62.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

63.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

64.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

65.     The UCL imposes strict liability. Plaintiff and members of the proposed Class need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

66.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

67.     Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendant's acts and practices offended an established public policy of transparency in pricing, including regulations enacted

by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

68.     The harm emanating from this practice to Plaintiff and members of the proposed Class outweighs any utility it provides because Defendant's practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### *"Fraudulent" Prong*

69.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

70.     Defendant's acts and practices alleged above constitute fraudulent business acts or practices as Defendant has deceived Plaintiff and members of the Class and is highly likely to deceive members of the consuming public. Plaintiff and members of the Class relied on Defendant's fraudulent and deceptive representations regarding its false ticket prices for products sold by Defendant. These misrepresentations played a substantial role in Plaintiff's and members of the proposed Class's decisions to purchase products at a purportedly steep discount, and Plaintiff and members of the Class would not have purchased products without Defendant's misrepresentations.

### *"Unlawful" Prong*

71.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

72.     Defendant's acts and practices alleged above constitute unlawful business acts or practices as Defendant has violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under

the FTC, false former pricing schemes, like Defendant's, are described as deceptive practices that would violate the FTCA:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - ***for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

73.     In addition, Defendant's acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published. ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

74.     Defendant violates § 17501 because it advertises items, including the items that Plaintiff purchased and are described herein, with a former price that greatly exceeds the prevailing market price of those items. Both on its price tags and online, Defendant advertises a "Date of Birth" which it claims was the date upon which it *began* selling the product at its full ticket price. In so doing, Defendant admits its ticket prices are intended to represent its own former price for the same or similar merchandise, thereby conceding its ticket prices are governed by section 17501 of the FAL. Moreover, while Carter's sells some exclusive branded products through its wholesale partners, such as Walmart, Target, and Amazon, the products at issue in this case are sold exclusively in Carter's own retail stores and on its own website. Accordingly, the prevailing market price of those items can be measured exclusively by reference to Carter's own historical sales data. And to the extent that the products offered through its wholesale distribution channels are

deemed "similar" products, Carter's internal wholesale sales data can be further compared to determine the prevailing market prices for such products.

75.    Under all circumstances, Plaintiff alleges that the ticket prices are not the prevailing market prices as required under the FAL. That is because Carter's almost always, if not always, sells its products, including the items purchased by Plaintiff, at prices substantially lower than the advertised former ticket price, thereby establishing that its ticket prices greatly exceed the prevailing market price of its merchandise in violation of Cal. Bus. & Prof. Code § 17501.

76.    As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

77.    As detailed herein, and for the same reason that Defendant's acts and practices violate the FTCA and the FAL, they also violate the CLRA, thus establishing another "unlawful" act in violation of the UCL.

78.    Defendant's practices, as set forth above, misled Plaintiff, the Class, and the public in the past and will continue to mislead them in the future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

79.    Defendant's violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff, members of the Class, and the public who, if Defendant's false pricing scheme is permitted to continue, will continue to be deceived into purchasing products based on illegal price comparisons. These false price comparisons lead to artificial and increased demand which, in turn, leads to higher prices and financial harm for consumers like Plaintiff and the members of the Class as described herein. Because of the surreptitious nature of Defendant's deception, these injuries cannot

be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendant's practice.

80.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff and members of the Class are entitled to preliminary and permanent injunctive relief enjoining Defendant from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff and the Class of all Defendant's revenues wrongfully obtained from them as a result of Defendant's unfair competition, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")
**CAL. BUS. & PROF. CODE §§ 17500, *et seq.***

81.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

82.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant for violations of California's FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

83.    Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the

CLASS ACTION COMPLAINT

exercise of reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

84.    The FAL further provides:

no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

Cal Bus. & Prof. Code § 17501.

85.    Defendant's routine of advertising discounted prices from false ticket prices, which are not and never have been the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold by Defendant are worth more than they actually are.

86.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff and members of the Class suffered economic injury.

87.    Plaintiff, on behalf of herself and the Class, requests that this Court order Defendant to restore this money to Plaintiff and the Class, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff, members of the Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

## THIRD CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, *et seq.***

88.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

89.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant for violations of the CLRA, Cal. Civ. Code § 1750, *et seq.*

90.    Plaintiff and each member of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendant's sale of products were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff and members of the Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

91.    Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of products sold at Defendant's brick and mortar stores and website, carters.com:

      a.    advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

      b.    making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

92.    Plaintiff and the Class are consumers who have suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendant's use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff therefore seeks an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper. Plaintiff additionally seek costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

93.     On August 14, 2024, Plaintiff, through counsel, sent a CLRA demand letter by certified mail to Defendant that provided notice of Defendant's violation of the CLRA as alleged herein, and demanded that Defendant notify all members of the Class and correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, Plaintiff would file a complaint seeking damages in accordance with the CLRA. If Defendant does not respond to Plaintiff's letter and agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782, Plaintiff will amend this complaint to seek actual, punitive, and statutory damages, as appropriate against Defendant.

94.     Filed concurrently is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

## VII.   PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

a.     an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

b.     awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

c.     awarding declaratory and injunctive relief as permitted by law or equity, including, an order enjoining Defendant from continuing the unlawful practices as set forth herein, retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief, and ordering Defendant to engage in a corrective advertising campaign;

       d.    retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

       e.    ordering payment of damages as permitted by law (and once Plaintiff has satisfied Cal. Civ. Code § 1782), including actual, compensatory, benefit of the bargain, statutory, and punitive damages, as appropriate, and to the fullest extent permitted by law;

       f.    awarding attorneys' fees and costs; and

       g.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: August 14, 2024

**LYNCH CARPENTER LLP**

By:  */s/ Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Matthew J. Zevin (SBN 170736)
mattz@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
James B. Drimmer (SBN 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:   (619) 762-1900
Facsimile:   (858) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

CLASS ACTION COMPLAINT